THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ERIC M. LOFERSKI, Defendant-Appellant.

First District (4th Division)   No. 1—90—0663

Opinion filed September 17, 1992.

Michael J. Pelletier and Martin Carlson, both of State Appellate Defender's Office, and Winston & Strawn, both of Chicago (Timothy P. O'Connor, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, David Stabrawa, and Steven M. Mondry, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

Defendant, Eric Loferski, was convicted of delivering more than 15 grams of a controlled substance (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(a)(2)) following a jury trial in the circuit court of Cook County. Defendant was sentenced to the penitentiary for a term of seven years.

Defendant appeals, contending: (1) the State failed to prove his guilt beyond a reasonable doubt. Defendant also contends he was denied a fair trial because: (2) the trial judge erroneously admitted into evidence (a) a photograph of defendant taken on the night of his arrest, and (b) certain hearsay statements; and (3) the prosecutor made improper and prejudicial remarks during closing argument. Defendant lastly contends (4) his sentence was excessive.

We affirm the judgment of the trial court.

BACKGROUND

The record contains the following pertinent facts. On June 13, 1988, defendant and James Krask were jointly indicted on one count of delivery of more than 15 grams of a controlled substance. Prior to trial, Krask pled guilty and was sentenced to 10 years in the penitentiary.

Defendant's trial began on January 10, 1990. The State's first witness was Agent Joseph Errico. Agent Errico was a member of the Cook County sheriff's police on assignment to the Northeastern Metropolitan Enforcement Group. The group is composed of State, county, and local police. Its purpose is to make undercover purchases of narcotics.

Agent Errico testified essentially as follows. On April 19, 1988, an informant introduced Errico to James Krask, who sold a gram of cocaine to Errico for $80. Approximately two hours later, Krask sold 21 grams of cocaine to Errico for $750. Each sale was made in Krask's apartment in Calumet City. The furniture in the apartment was arranged and not in disarray. Errico did not notice a telephone in Krask's apartment. At no time during these two sales did Krask mention defendant. Krask gave Errico a pager number and told Errico that he could contact him at any time for additional purchases.

At approximately 5 p.m. on April 20, Agent Errico telephoned Krask's pager number. Krask telephoned Agent Errico approximately five minutes later. They agreed that Krask would sell eight ounces of cocaine to Errico for $7,500. Krask instructed Errico to meet Krask at 8 p.m. that night at his apartment. At no time during this telephone conversation did Krask mention defendant. Errico then met with his fellow agents to plan their surveillance of the transaction.

At approximately 8 p.m., Agent Errico arrived at Krask's apartment. Errico noticed that Krask's furniture was arranged in the same manner as the previous day. Krask opened his apartment door and walked into the hallway. A few moments later, defendant joined them in the hallway and Krask introduced defendant to Errico. Krask told Errico that he would obtain the cocaine, give it to defendant, who would give it to Errico. Defendant stood silently next to Krask during these instructions.

The three of them walked outside of the apartment building. Defendant walked away from them. Krask asked Agent Errico to show him the purchase money. They walked to and entered Errico's automobile, where Errico showed Krask $7,500 in $100 bills. Krask counted the money and returned it to Errico. Krask told Errico that Krask would retrieve the cocaine and that Errico should page him in one half hour. Krask would then tell Errico where they would meet. After Krask left the car, Agent Errico telephoned his supervisor and reported the arrangement.

Errico paged Krask at the agreed time. When Krask telephoned Errico, he instructed Errico to meet him at the corner of Warren and

Wentworth Streets in Calumet City. Errico immediately notified his surveillance team.

Agent Errico arrived at the *rendezvous* at approximately 9:10 p.m. A few minutes later, Krask arrived and entered Errico's car on the front passenger side. Krask told Errico to drive one block down the street, where Krask's tan Plymouth Duster was parked. Defendant was waiting inside the car with the cocaine. Errico initially refused to comply; he was concerned about leaving the protective vision of the surveillance team. Krask then exited Errico's car and walked in the direction of his car. A few minutes later, Krask returned and repeated his instructions. Errico complied this time because he knew that Krask could not get the cocaine.

With Krask sitting next to him in the front passenger seat, Agent Errico drove for a block and stopped parallel to the parked Duster. Defendant was sitting in the driver's seat of the Duster. Krask told Errico that defendant had the cocaine and that defendant would enter Errico's car and give the cocaine to him. Krask exited Errico's car and entered the Duster; defendant exited the Duster and entered the front passenger side of Errico's car. Defendant held a brown paper bag.

Krask drove off in the Duster. After defendant entered Errico's car, Errico parked across the street. Defendant gave Errico the brown paper bag. Errico opened the bag and saw a clear plastic bag, which contained another clear plastic bag, which in turn contained a white powdery substance. In return, Errico gave defendant the $7,500 that he showed to Krask.

As defendant was counting the money, Errico signalled the surveillance team to apprehend the suspects. Seconds later, team members arrested defendant, who was still sitting in the front passenger seat of Errico's car with the purchase money in his hands. Defendant was in Errico's car for a total of one minute. Krask was arrested a short time later.

The State's next witness was Agent Fred Guerra. Agent Guerra was a member of the Cook County sheriff's police on assignment to the Northeastern Metropolitan Enforcement Group. On the night of April 20, 1988, Guerra was a member of the surveillance team that covered Errico's narcotics purchase. Guerra was parked approximately one block away from Errico; when Errico moved his car, Guerra followed. Guerra observed the actions of Krask, defendant, and Errico; Guerra's testimony essentially corroborated that of Errico. When Guerra and the other agents arrested defendant, Guerra saw the purchase money in defendant's hands.

The State's last witness was Nancy Hall, who was a chemist with the Illinois State Police. Hall opined that the white powdery substance that Errico purchased on the night of defendant's arrest contained cocaine.

Defendant was the sole witness for the defense. He testified essentially as follows. Defendant was 17 years old at the time of his arrest and was a junior in high school. He and James Krask's younger brother, Dan, were friends. Defendant and Dan were approximately four years younger than James Krask.

During school on the morning of April 20, 1988, Dan asked defendant to help him and Krask move some items into Krask's apartment. Defendant agreed. That afternoon, they went to the Krask household, where Krask and his girl friend packed.

Later that night, the four of them drove to Krask's apartment. Krask drove his Plymouth Duster, accompanied by defendant and Dan; Krask's girl friend drove another car. One of the items for Krask's apartment was a large console television. The apartment's existing furnishings were put in disarray as a result of the move. In return for their assistance, Krask bought beer for the group, which defendant drank.

The group arrived at Krask's apartment between 6 and 7 p.m. A short time after the group's arrival, two men arrived whom defendant did not know. Approximately 20 minutes later, Agent Errico arrived. Krask answered the door and spoke with Errico in the doorway. Defendant was sitting in a chair. Defendant was not part of the conversation; he did not know the subject of their conversation.

Krask turned and told defendant to come with him. By that time, defendant had been in the apartment for nearly two hours and had drunk four or five beers. Defendant rose from his chair, put on his coat, and walked past Krask and Errico, who were closely facing each other while talking. When the three of them reached the apartment building entrance, defendant walked straight to Krask's Duster and remained there. Krask and Errico stood at the building entrance and continued to speak. When they exited the building, they walked away together. Defendant did not follow them and did not hear what they said.

Krask soon returned alone. He gave defendant the keys to his girl friend's car and told defendant to follow him. Defendant followed Krask to a house in Dyer, Indiana. Krask parked in the driveway and defendant parked behind him. Krask instructed defendant to wait and then walked out of defendant's sight. Krask returned in approximately 15 minutes and instructed defendant to follow him back to

Calumet City. Defendant did not see Krask holding a brown paper bag or any other package.

Defendant followed Krask back to Calumet City. Krask stopped and used a public telephone. Defendant stayed in the car he was driving. He did not know to whom Krask spoke; he did not ask. After his telephone call, Krask instructed defendant to trade cars and follow him. So defendant, driving the Duster, followed Krask to a residential neighborhood. Krask motioned defendant to pull over and defendant complied. Krask told defendant to wait in the car and then drove away. Krask returned on foot a few minutes later. He paced back and forth on the sidewalk and appeared to look for someone or something.

Krask then appeared in a car driven by Agent Errico. Krask exited Errico's car and went to defendant. Krask instructed defendant to take the package that was underneath the driver's seat, enter Errico's car, and give Errico the package. Defendant retrieved the package and exited the Duster. As soon as Krask entered the Duster, he drove away.

Defendant entered Errico's car and gave him the package. Defendant did not know the contents of the package; he did not look inside of it or squeeze it or otherwise feel it to test for its contents. Errico handed defendant money, which defendant accepted. However, defendant did not count it. Defendant was apprehended by the surveillance team seconds after he entered Errico's car. By the time the team appeared, defendant no longer held the money. After defendant was apprehended, Errico apologized to defendant for involving him in the arrest and told defendant that the team "just wanted to get him [Krask]."

Defendant also testified that he was not a drug dealer. He never suspected Krask of wrongdoing; he assumed that Krask had a reason for whatever he did. Defendant believed that he was doing Krask a favor. Also, he no longer maintains a friendly relationship with any member of the Krask family.

The jury convicted defendant as charged. At the sentencing hearing, the trial judge denied defendant's post-trial motion. At the close of the hearing, the trial judge sentenced defendant to a prison term of seven years. Defendant appeals.

Opinion

I

Defendant claims that the evidence failed to establish guilt beyond a reasonable doubt. Where a criminal conviction is challenged based

on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational fact finder could have found beyond a reasonable doubt the essential elements of the crime. A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276-77.

To sustain a conviction for the offense of unlawful delivery of 15 or more grams of cocaine, the State must prove beyond a reasonable doubt that the defendant knowingly delivered, or possessed with the intention to deliver, 15 or more grams of any substance containing cocaine. (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(a)(2).) The offense is committed when one delivers cocaine to another. The material element of the offense is delivery. *People v. Zambetta* (1985), 132 Ill. App. 3d 740, 749, 477 N.E.2d 821, 828; *People v. Kadlec* (1974), 21 Ill. App. 3d 289, 296, 313 N.E.2d 522, 527-28.

Proof that the defendant "knowingly" delivered a controlled substance is an essential element of the offense. The element of knowledge is rarely susceptible of direct proof. However, it may be proved by evidence of defendant's statements or conduct, from which the fact finder may fairly infer defendant's knowledge. (*People v. Ernst* (1991), 219 Ill. App. 3d 51, 57, 579 N.E.2d 376, 381; *People v. Chicon* (1977), 55 Ill. App. 3d 100, 105, 370 N.E.2d 605, 609.) Knowledge is a question of fact to be determined by the fact finder. *People v. Monroe* (1975), 32 Ill. App. 3d 482, 489, 335 N.E.2d 783, 789, *aff'd* (1977), 66 Ill. 2d 317, 362 N.E.2d 295.

■ We conclude that the record in the present case contains sufficient proof that defendant knowingly delivered the cocaine. The evidence boils down to the testimony of Agents Errico and Guerra against that of defendant. Thus, the issue of defendant's guilt was one of credibility for the fact finder. (See *People v. Guido* (1962), 25 Ill. 2d 204, 208, 184 N.E.2d 858, 860.) The testimony of a single witness, including that of a law enforcement officer, if positive and credible, is sufficient to convict, even if it is contradicted by the defendant. *Guido*, 25 Ill. 2d at 208-09, 184 N.E.2d at 860.

Although defendant denied knowledge of the cocaine, the jury was not required to accept his exculpatory testimony. (*Ernst*, 219 Ill. App. 3d at 57, 579 N.E.2d at 381.) After carefully reviewing the entire record, we cannot say that the evidence is so improbable or unsatisfactory as to create a reasonable doubt of defendant's guilt.

## II

Defendant next claims that he was denied a fair trial. He contends the trial judge erroneously admitted into evidence (A) a photograph of him taken on the night of his arrest, and (B) certain hearsay statements.

## A

During the State's direct examination of Agent Errico, the following colloquy occurred:

"[Prosecutor]: Now, you testified, or you identified Mr. Loferski here in court today previously, is that right?

[Agent Errico]: That's correct.

Q. On the date of April 20th, 1988 did Mr. Loferski look any different at that time than he does here today?

A. Yes, he does.

Q. How does he look different today then he did then?

A. He looks a lot better now. He's clean-cut now.

[Defense counsel]: Objection.

THE COURT: Sustained. Stricken.

[Prosecutor]: I'm showing you what I have previously marked as People's Exhibit Number 3 for Identification. For the record, Judge, I did show this to counsel.

[Defense counsel]: All right.

[Prosecutor]: Do you recognize what that is?

A. Yes, that's the Defendant, Eric Loferski.

Q. This is a photograph?

A. Yes, it is.

Q. And when was that photograph taken?

A. On the night of his arrest.

Q. That would be on April 20th, 1988?

A. That's correct.

Q. Does that photograph truly and accurately portray the Defendant, Eric Loferski, as he appeared on the night of April 20th, 1988?

A. That's correct.

[Prosecutor]: Thank you. May I have a few moments, Judge?

THE COURT: Sure."

The record further shows that the photograph was subsequently admitted into evidence and was with the the jury during its deliberations.

## 1

The record shows that defendant failed to object at trial and to include the objection in his post-trial motion. Ordinarily, we would deem the issue waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130.) However, Supreme Court Rule 615(a) provides an exception to the waiver rule where there has been "plain error." (134 Ill. 2d R. 615(a).) Under this rule, we may elect to consider errors that have not been properly preserved for review where the evidence at trial is closely balanced or where the errors were of such magnitude that a defendant was denied a fair trial. *People v. Lucas* (1981), 88 Ill. 2d 245, 250-51, 430 N.E.2d 1091, 1093-94.

Where the evidence at trial is closely balanced, our supreme court has explained as follows:

"The main purpose of the plain error rule, if the evidence is closely balanced, is to protect against the 'possibility that an innocent person may have been convicted due to some error which is obvious from the record, but not properly preserved' for appellate review. [Citation.] In cases where the evidence is closely balanced, the probability that a defendant's conviction was caused by even a minor trial error is greatly enhanced. Therefore, in those cases, the court will invoke the plain error rule so that it can determine whether an error, which was not objected to at trial and in post-trial motions, raises doubt as to the validity of the jury's verdict." *People v. Mullen* (1990), 141 Ill. 2d 394, 402, 566 N.E.2d 222, 226, quoting *People v. Carlson* (1980), 79 Ill. 2d 564, 576, 404 N.E.2d 233, 238.

■ In the case at bar, we conclude that the evidence, while sufficient to prove guilt, was closely balanced. We recited the evidence at length. As we noted earlier, the evidence boiled down to the testimony of Agents Errico and Guerra against that of defendant. Thus, the issue of defendant's guilt was one of credibility. Defendant claims that he was prejudiced by the admission of his photograph, taken on the night of his arrest. If the evidence was improperly admitted, the jury's verdict may have been a result of this alleged error despite defendant's failure to preserve it. Therefore, we will consider the issue. See *People v. Darnell* (1990), 214 Ill. App. 3d 345, 360, 573 N.E.2d 1252, 1262; *People v. Andino* (1981), 99 Ill. App. 3d 952, 955, 425 N.E.2d 1333, 1335.

## 2

Defendant argues that the photograph taken of him on the night

of his arrest was irrelevant and prejudicial. The primary requirements for the admissibility of a photograph are those of relevancy and accuracy. Focusing on the relevancy requirement, the photograph must be identified by a witness as a portrayal of certain facts relevant to the issue. (*People v. Holman* (1984), 103 Ill. 2d 133, 149, 469 N.E.2d 119, 127, quoting *People v. Thomas* (1967), 88 Ill. App. 2d 71, 80-81, 232 N.E.2d 259, 264; *People v. Donaldson* (1962), 24 Ill. 2d 315, 318, 181 N.E.2d 131, 133.) Evidence is relevant, and thus admissible, if it tends to prove a material fact at issue. (*People v. Eyler* (1989), 133 Ill. 2d 173, 217, 549 N.E.2d 268, 288; *People v. Free* (1983), 94 Ill. 2d 378, 413, 447 N.E.2d 218, 235.) Relevant photographs are admissible, in the trial court's discretion, to prove a person's identity. Also, the admission of a photograph into evidence does not necessarily become cumulative merely because there is also oral testimony on the same subject. *People v. Myles* (1985), 131 Ill. App. 3d 1034, 1042, 476 N.E.2d 1333, 1339.

■ Applying these principles to the case at bar, we conclude that the photograph was properly admitted into evidence. It is true that Agent Errico had identified defendant earlier in his testimony. However, the photograph was relevant to show defendant's identity and it corroborated Agent Errico's identification of defendant on the night of his arrest. The photograph was not admitted to prove defendant's bad moral character, thus distinguishing this case from *People v. Kannapes* (1990), 208 Ill. App. 3d 400, 567 N.E.2d 377. We cannot say that the trial judge exceeded his discretion in admitting the photograph into evidence.

## B

Defendant contends the trial court improperly admitted into evidence three alleged hearsay statements. The first statement occurred outside of Krask's apartment. Krask explained to Agent Errico that Krask would obtain the cocaine, give it to defendant, and defendant would give it to Errico. The second statement occurred when Krask entered Errico's car prior to the transaction. Krask explained to Errico that defendant was waiting in the tan Duster with the cocaine. The third statement occurred when Errico and Krask parked alongside Krask's car. Krask explained to Errico that defendant had the cocaine and would enter Errico's car and give the cocaine to Errico.

The acts and deliberations of a coconspirator made in furtherance of the conspiracy are admissible against a defendant even when they are made outside of the defendant's presence. To avail itself of the coconspirator's exception to the rule against hearsay, the State need not

charge the crime of conspiracy, nor indict and try all of the coconspirators. Rather, the State need only establish a *prima facie* case through independent evidence that two or more persons were engaged in a common plan to accomplish a criminal goal or to reach another end by criminal means. The existence of an agreement, which is the essence of a conspiracy, need not be proved by direct evidence, but may be inferred from all of the surrounding facts and circumstances, including the acts and declarations of the defendant. *People v. Katsigiannis* (1988), 171 Ill. App. 3d 1090, 1099, 526 N.E.2d 508, 515, cited in *People v. Brock* (1989), 184 Ill. App. 3d 595, 599, 540 N.E.2d 554, 556-57.

■ After carefully reviewing the record, we conclude that the record contains sufficient evidence to establish a *prima facie* case of conspiracy so as to allow the admission of Krask's statements. The record contains evidence that defendant stood silently next to Krask during Krask's explanation of the conspiracy to Agent Errico. Defendant followed Krask by car at night to several locations. Defendant parked and waited in the tan Duster for Krask. Defendant then entered Errico's car and gave Errico a brown paper bag containing cocaine. Errico gave defendant $7,500, and defendant was counting the money when he was arrested. This conduct of defendant constituted sufficient evidence to establish a *prima facie* case of conspiracy.

Further, it is clear that Krask made all three statements to Errico to explain the details of the transaction. It is settled that "statements of one co-conspirator accompanying or explaining the common design are admissible against all co-conspirators." (*People v. Miller* (1984), 128 Ill. App. 3d 574, 586, 470 N.E.2d 1222, 1230.) We cannot say that the trial court exceeded its discretion in admitting Krask's statements.

## III

Defendant contends he was denied a fair trial also because the two trial prosecutors made improper and prejudicial remarks during closing argument. The remarks are as follows:

> "Ladies and gentlemen, I don't have to tell you what a cancer poses [*sic*] in our society today. The contents in that bag hurt many families, they have ruined many lives. The war on drugs we all know about. The war on drugs is a national war. We hear that every day. However, the war on drugs affects all of us today at the local level. We're all hurt to an extent, we're all affected, just by our very presence in this courtroom. It has

consequences. If you want to play with this stuff, if you want to get involved with this stuff, you have to pay the consequences. Those are the rules. Some get caught and some don't.

* * *

You have a unique opportunity today. You hear a lot of people talking about the war on drugs and how it affects each of us. You have a unique opportunity today; you have an opportunity to say, enough is enough, enough is enough. We are sick and tired of drugs. We are sick and tired of people that deal drugs. Nothing good comes from dealing drugs. That's a fact. You have a chance today to say something about that.

* * *

Ladies and gentlemen, *** there is no doubt that drugs are a problem in our society. We all know it. And they are running rampant. Drug dealers are selling drugs like cocaine every single day, all around us. I think we all recognize that. And there is a war on drugs now that exists. And Officers like Joe Errico and Fred Guerra are both a part of that war. They are trying to do something about it. That's what their job is.

* * *

Ladies and gentlemen, you have an opportunity here, you have a chance here to make him accountable for his actions. You have a chance to say, we are not going to take this, we are not going to believe these stories when you get caught right in the act. You've got a chance to make Eric Loferski responsible and accountable for what he did, and send a message to drug dealers like him, who attempt to insulate themselves."

We note that defendant failed to object to these remarks during the argument and also failed to include the objection in his post-trial motion. However, as with the previous issue, we will consider this issue under the plain error doctrine. 134 Ill. 2d R. 615(a); *Mullen*, 141 Ill. 2d at 402, 566 N.E.2d at 226.

A reviewing court is reluctant to set aside a verdict based on remarks made during closing argument and does so only where the remarks are clearly prejudicial. In determining whether the remarks are prejudicial, a court must refer to the language used, its relation to the evidence, and the effect of the argument on the rights of the accused to a fair and impartial trial. *People v. Franklin* (1976), 42 Ill. App. 3d 408, 421, 355 N.E.2d 634, 645.

Further, it is "axiomatic that [in closing argument] the prosecutor must confine himself to facts introduced in evidence and to the fair and reasonable deductions and conclusions to be drawn therefrom."

(*People v. Vasquez* (1972), 8 Ill. App. 3d 679, 681, 291 N.E.2d 5, 7.) It is settled that "a prosecutor may reflect unfavorably upon an accused and indulge in invective in urging the fearless administration of the law, based upon the evidence and legitimate inferences drawn from it." (*People v. Hovanec* (1979), 76 Ill. App. 3d 401, 424, 394 N.E.2d 1340, 1356.) However, "it is improper for a prosecutor to say anything in argument the only effect of which will be to inflame the passion or arouse the prejudice of the jury against a defendant without shedding any light on the paramount question presented to the jury, to-wit, its decision." *People v. Lurry* (1979), 77 Ill. App. 3d 108, 114, 395 N.E.2d 1234, 1238.

Defendant argues that the prosecutors' repeated references to the "war on drugs" were not based on the evidence or reasonable inferences drawn from it. Rather, defendant argues, the remarks were calculated to inflame the passion or arouse the prejudice of the jury.

■ Defendant's argument has some merit. It is difficult to see how our nation's "war on drugs" had anything to do with the evidence presented at this particular trial on the question of the guilt or innocence of this particular defendant. Defendant cites *United States v. Solivan* (6th Cir. 1991), 937 F.2d 1146, in support of his argument. The *Solivan* court was presented with a prosecutor's closing argument that invoked the "war on drugs" with remarks that were far more restrained than those in the present case. The *Solivan* court cited several decisions of the Federal courts of appeal that held essentially that "prosecutors are not 'at liberty to substitute emotion for evidence by equating, directly or by innuendo, a verdict of guilty to a blow against the drug problem.'" 937 F.2d at 1152, quoting *United States v. Hawkins* (D.C. Cir. 1978), 595 F.2d 751, 754.

The *Solivan* court held: "It is error for a prosecutor to direct the jurors' desires to end a social problem toward convicting a particular defendant." (937 F.2d at 1153.) In the context of the "war on drugs," the court reasoned as follows:

> "Here, defendant's constitutional right to a fair trial was violated because the appeal to the community conscience in the context of the War on Drugs prejudicially impacted on her. The fear surrounding the War on Drugs undoubtedly influenced the jury by diverting its attention away from its task to weigh the evidence and submit a reasoned decision finding defendant guilty or innocent of the crimes with which she was charged. The substance of the statements made by the prosecutor in this case were designed, both in purpose and effect, to arouse passion and prejudice and to inflame the jurors' emotions regard

ing the War on Drugs by urging them to send a message and strike a blow to the drug problem.

This nation faces a variety of social problems with which all citizens are daily confronted. The drug problem is one of the most compelling and devastating problems faced by this nation today. This Court is acutely aware of the nature and extent of the drug problem. However, government prosecutors are not at liberty to urge jurors to convict defendants as blows to the drug problem faced by society or specifically, within their communities, or to send messages to all drug dealers. Such appeals are extremely prejudicial and harmful to the constitutional right to a fair trial." (937 F.2d at 1153-54.)

The court reversed the conviction and remanded the cause for a new trial. *Solivan*, 937 F.2d at 1157.

We additionally note that the American Bar Association considers such prosecutorial remarks to be unprofessional conduct. Section 3—5.8(d) of the Association's Standards for Criminal Justice states as follows:

"The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict." (1 A.B.A., Standards for Criminal Justice §3—5.8(d) (2d ed. 1980).)

The section commentary specifically states: "Predictions as to the effect of an acquittal on lawlessness in the community also go beyond the scope of the issues in the trial and are to be avoided." 1 A.B.A. Standards for Criminal Justice §3—5.8, at 3-90 (2d ed. 1980).

Although the analysis in these authorities is persuasive, the *Solivan* decision does not control our decision in the present case. Because lower Federal courts do not exercise appellate jurisdiction over State courts, decisions of lower Federal courts are not binding on State courts. *People v. Brisbon* (1989), 129 Ill. 2d 200, 224, 544 N.E.2d 297, 308; *People v. O'Neal* (1976), 40 Ill. App. 3d 448, 450, 352 N.E.2d 282, 283.

The analysis in *Solivan* and the American Bar Association's professional standards do not reflect Illinois law. Our supreme court has consistently held that a prosecutor's rhetoric during closing argument that urges a conviction to fight societal evils is permissible argument concerning the evil results of crime and the fearless administration of the law. (*E.g., People v. Harris* (1989), 129 Ill. 2d 123, 159-60, 544 N.E.2d 357, 372-73; *Siebert v. People* (1892), 143 Ill. 571, 590, 32

N.E. 431, 436.) This court has held likewise. (*E.g., People v. Finley* (1978), 63 Ill. App. 3d 95, 101-02, 379 N.E.2d 645, 649.) Indeed, Illinois courts have specifically held that a prosecutor's argument to the jury about the evils of drug abuse and the need to punish drug dealers fell within this category. *People v. Lopez* (1957), 10 Ill. 2d 237, 240-41, 139 N.E.2d 724, 725-26; *People v. Hunter* (1984), 124 Ill. App. 3d 516, 534-35, 464 N.E.2d 659, 675; *People v. Bianchi* (1981), 96 Ill. App. 3d 113, 117, 420 N.E.2d 1187, 1191.

One commentator has noted that Illinois and Texas are "leading examples" of States whose courts permit the "virtually unlimited" use of such rhetoric. (Comment, *Prosecutors' Deterrence Appeals in State Criminal Trials*, 48 U. Chi. L. Rev. 681, 688 (1981).) Further, cases that permit these remarks generally fail to articulate a rationale beyond the bald statement that such rhetoric has always been accepted. 48 U. Chi. L. Rev. at 691.

It is the duty of this court to follow the decisions of our supreme court. (*People v. Palmer* (1986), 141 Ill. App. 3d 234, 238, 490 N.E.2d 154, 158; *O'Neal*, 40 Ill. App. 3d at 450, 352 N.E.2d at 283.) Our supreme court and this court have repeatedly upheld remarks similar to those made by the prosecutors in the case at bar. Thus, we must conclude that the prosecutor's remarks during closing argument concerning the "war on drugs" were not erroneous.

We note defendant's argument that the cumulative effect of the preceding trial errors prejudiced him and requires a new trial. However, we have not accepted any of defendant's allegations of error. Therefore, we likewise cannot accept this argument. See *People v. Albanese* (1984), 102 Ill. 2d 54, 82-83, 464 N.E.2d 206, 220.

## IV

Defendant lastly claims that his seven-year prison sentence was excessive. Defendant points, *inter alia*, to his age and lack of prior convictions.

Supreme Court Rule 615(b)(4) authorizes this court to reduce a criminal sentence. (134 Ill. 2d R. 615(b)(4).) However, a sentencing decision is a matter of judicial discretion, and so long as the sentence is within the statutory limits, we hesitate to exercise our power to reduce it absent a finding that the trial court exceeded its discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 883.) In other words, a "rebuttable presumption arises that the sentence imposed was proper and is only overcome by an affirmative showing that the sentence imposed varies greatly from the purposes and spirit of the law or is manifestly violative of constitutional guidelines." *Peo-*

*ple v. Jenkins* (1984), 128 Ill. App. 3d 853, 857, 471 N.E.2d 647, 650, citing *People v. Gallardo* (1983), 112 Ill. App. 3d 764, 775-76, 445 N.E.2d 1213, 1222.

After reviewing the record in the present case, we cannot say that the trial court exceeded its discretion. The seven-year sentence was on the very low end of the statutory range, which begins at six years. (See Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(3); ch. 56½, par. 1401(a).) The record shows that the trial judge considered many different factors before imposing sentence. We hold that defendant's prison sentence of seven years was well within the discretion of the trial court.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JIGANTI, P.J., and McMORROW, J., concur.